**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SHILPA VERMA,

    *Plaintiff*,

  v.

U.S. CITIZENSHIP AND IMMIGRATION
SERVICES, *et al.*,

    *Defendants.*

Civil Action No. 20-3419 (RDM)

## MEMORANDUM OPINION AND ORDER

Plaintiff Shilpa Verma, a lawful nonimmigrant national of India, brings this action under the Administrative Procedure Act, 5 U.S.C. § 706 ("APA"), and the Mandamus Act, 28 U.S.C. § 1361, seeking to compel Defendant the United States Citizenship and Immigration Services ("USCIS") and its Associate Director, Defendant Tracy Renaud, to adjudicate her pending applications to extend her H-4 status and to issue and to deliver her a renewed Employment Authorization Document ("EAD").  *See generally* Dkt. 1 (Compl.); Dkt. 9-1 at 1 (Verma Decl. ¶¶ 1–2).  Because Plaintiff "will lose work authorization imminently when her current [EAD] expires [on] December 19, 2020," she moves for a Temporary Restraining Order ("TRO") and Preliminary Injunction "directing Defendants to immediately provide her with evidence of continuing work authorization beyond December 19, 2020 for the duration of this proceeding." Dkt. 9 at 1–2.

For the reasons explained below, Plaintiff's Motion for a TRO and Preliminary Injunction, Dkt. 9, is **DENIED**.

## I.  BACKGROUND

**A.      Statutory and Regulatory Background**

This suit concerns three related immigration programs.

The first program is known as the H1-B visa program.  Under it, nonimmigrant aliens may temporarily be admitted into the United States "to perform services . . . in a specialty occupation."  8 U.S.C. § 1101(a)(15)(H)(i)(b).  To obtain an H-1B visa, a nonimmigrant's sponsoring employer must submit a Form I-129 to USCIS requesting issuance of a visa.  *Id.* § 1184(c).  If approved, an H-1B visa is valid for an initial period of up to three years and can be extended for an additional three years.  *Id.* § 1184(g)(4); 8 C.F.R. §§ 214.2(h)(9)(iii)(A)(1), (h)(15)(ii)(B)(1).  An applicant who has a specified employment-based petition for immigrant status pending may receive an extension of H-1B status beyond the six-year maximum.  *See* American Competitiveness in the Twenty-First Century Act, Pub. L. No. 106-313, §§ 104(c), 106(a) (2000), *as amended by* Pub. L. No. 107–273, § 11030A (2002) (codified at 8 U.S.C. § 1184 note).

The second program is known as the H-4 visa program.  Under it, the spouse and minor children of an H-1B visa holder may be admitted to the United States along with the H-1B visa holder.  8 U.S.C. § 1101(a)(15)(H).  To obtain an H-4 visa or to apply for an extension of an existing H-4 visa, an eligible applicant must submit to USCIS a Form I-539.  If approved, the H-4 visa is subject to the same period of admission as the H-1B visa held by the H-4 visa holder's spouse or parent.  8 C.F.R. § 214.2(h)(9)(iv).

The third program is known as the EAD program.  Unlike nonimmigrants with an H-1B visa, "[n]onimmigrants with H-4 status are approved to live, but not necessarily work, in the United States."  *Muvvala v. Wolf*, No. 20-cv-2423, 2020 WL 5748104, at *1 (D.D.C. Sept. 25, 2020) (citing *Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 111 (D.D.C.

2

2015)).  H-4 visa holders who are not approved to work may, however, apply for temporary employment authorization—that is, an EAD.  *See* 8 C.F.R. §§ 214.2(h)(9)(iv), 274a.12(c)(26). As relevant here, "an eligible H-4 visa holder" may do so by filing "a complete Form I-765 . . . accompanied by 'documentary evidence establishing eligibility, including evidence of the spousal relationship' between the H-4 visa holder and the H-1B visa holder, evidence that 'the principal H-1B [holder] is the beneficiary' of an application for legal permanent residence, and evidence that the H-1B beneficiary and the H-4 visa holder are current in their respective immigration statuses."  *Nibber v. U.S. Citizenship and Immigr. Servs.*, No. 20-cv-3207, 2020 WL 7360215, at *1 (D.D.C. Dec. 15, 2020) (quoting 8 C.F.R. § 214.2(h)(9)(iv)).

In March 2019, USCIS began requiring "all applicants submitting an I-539 application for H-4 status to appear at the application support center closest to the applicant's primary residence and provide biometric information such as fingerprints, a photograph, or a signature." *Muvvala*, 2020 WL 5748104, at *1 (citing 8 C.F.R. § 103.2(b)(9)).  According to an agency representative, "[t]he long-term agency objective is to incorporate biometrics . . . across most or all form types, with the Form I-539 being the first to undergo the change."  Dkt. 12-1 at 2 (Rosales Decl. ¶ 6).  That representative further notes that "Forms I-539 and I-765 are [adjudicated] on a first-in-first-out basis"—meaning that the applications that have been pending the longest are adjudicated first.  *Id.* (Rosales Decl. ¶ 4).

## B.    Factual Background

Plaintiff Shilpa Verma, a citizen of India, has resided in the United States since January 31, 2009.  Dkt. 9-1 at 1 (Verma Decl. ¶¶ 1, 3).  She is currently employed as "the HR Technology Workday Learning Function Lead for Otis Elevator Company," in which capacity she helps implement online human resources management and training tools.  *Id.* at 3 (Verma Decl. ¶ 14).  Plaintiff's spouse, Rishi Verma, is currently an H-1B visa holder, employed by

Saviynt, Inc.  *Id.* at 2 (Verma Decl. ¶ 2).  According to Plaintiff, her husband's immigration status renders her eligible for H-4 status, employment authorization, and eventually, lawful permanent residence as a derivative beneficiary.  *Id.* at 1–2 (Verma Decl. ¶¶ 3–5).

Plaintiff was first "issued work authorization pursuant to [her] H-4 status" in 2015.  *Id.* at 2 (Verma Decl. ¶ 6).  "Upon becoming eligible," she "applied for and received an EAD authorizing [her] to work."  *Id.* (Verma Decl. ¶ 7).  That EAD was "valid from August 26, 2015 to September 5, 2017," after which Plaintiff sought and received two renewals of her EAD, extending the EAD to December 19, 2020.  *Id.*  Plaintiff became eligible to file an additional renewal application on June 23, 2020—six months prior to the expiration of her H-4 and EAD status.  *Id.* (Verma Decl. ¶¶ 10–11).[1]

Although she was eligible to file in late June, Plaintiff waited to file her applications to extend her H-4 status and renew her EAD until August 10, 2020.  *Id.* (Verma Decl. ¶¶ 8–9).

---

[1]  Plaintiff repeatedly asserts that USCIS's regulations require that Forms I-539 and I-765 be filed no earlier than six months prior to the expiration of the H-4 Visa and EAD, respectively. Dkt. 9 at 16, 18; Dkt. 14 at 7.  Although Plaintiff cites no authority for that proposition, neither does USCIS contest it.  For its part, the Court understands the statutory and regulatory scheme as follows:  8 C.F.R. § 214.2(h)(3)(iii)(I) provides that "[a] petition filed under [8 U.S.C. §] 101(a)(15)(H) . . . may not be filed earlier than 6 months before the date of actual need for the beneficiary's services or training."  Section 101(a)(15)(H), in turn, permits nonimmigrants to apply for H-1B and H-4 visas, which, as explained, are governed by Forms I-129 and I-539, respectively.  Consequently, under 8 C.F.R. § 214.2(h)(3)(iii)(I), Forms I-129 and I-539 "may not be filed earlier than 6 months before" their respective visas' expirations.  That leaves the EAD and Form I-765.  Under 8 C.F.R. § 274a.13(a), "[a]n alien requesting employment authorization or an E[AD] . . . may file such request concurrently with a related benefit request [for example, an H-4 visa] that, if granted, would form the basis for eligibility for employment authorization."  That an EAD application may be filed "concurrently" with an H-4 visa application implies that an EAD application may not be filed *earlier* than an H-4 application, meaning, then, that the six-month window for submitting a Form I-539 applies to a Form I-765 as well.  *Id.*; *cf.* Employment Authorization for Certain H-4 Dependent Spouses, 80 Fed. Reg. 10,284, 10,299 (Feb. 25, 2015) (to be codified at 8 C.F.R. pt. 214, 274) ("DHS's policy to permit concurrent filing of Forms I-539, I-129, and I-765 should also help H-4 dependent spouses avoid gaps in employment authorization, as these forms may be filed concurrently up to six months in advance of date of need.").

USCIS subsequently scheduled Plaintiff's biometric examination for December 8, 2020. *Id.* at 5 (Verma Decl. ¶ 25); *see also* Dkt. 12-1 at 3 (Rosales Decl. ¶ 9). Plaintiff attended the examination, and her biometrics were accordingly captured. Dkt. 9-1 at 5 (Verma Decl. ¶ 25); *see also* Dkt. 12-1 at 3 (Rosales Decl. ¶ 9). Plaintiff's H-4 and EAD applications are now pending adjudication at USCIS's California Service Center ("CSC"). Dkt. 12-1 at 1 (Rosales Decl. ¶ 2). There is nothing left for Plaintiff to do but wait.

That wait is at issue here. According to Dina Rosales, the Supervisory Immigration Services Officer at the CSC responsible for overseeing the adjudication of applications like Plaintiff's, as of December 15, 2020, "the average time between filing and adjudication of H-4 (Form I-539) applications at the C[SC] is approximately 17 to 22 months," *id.* at 3 (Rosales Decl. ¶ 10); *see also* Dkt. 12-2 at 1 (Lotspeich Decl. ¶ 4), while, "the average time between the filing and adjudication of standalone H-4 Employment Authorization Document (Form I-765) applications at the C[SC] is approximately 13 to 17 months," Dkt. 12-1 at 3 (Rosales Decl. ¶ 11). There are roughly 750 applications in the queue ahead of Plaintiff's, which, according to Rosales, means that "the remaining processing time [for Plaintiff's applications] is approximately 6 months" from December 15, 2020. *Id.* (Rosales Decl. ¶¶ 13–14).

In the meantime, Plaintiff will be barred from working. According to Plaintiff, her absence "will create a tremendous amount of pressure on other team members and [her] employer," who are currently engaged in "a major data migration project for [Otis]" that Plaintiff "lead[s]" and which will [launch] in mid-December." Dkt. 9-1 at 3 (Verma Decl. ¶ 15); *see also* Dkt. 15-1 at 1–2 (Williams-Rivera Decl. ¶¶ 3–6). Not only will "[t]he interruption of [Plaintiff's] work . . . have serious negative consequences to [her] employer and [her] career," it will "risk [her] losing [her] job" and "salary of $97,500 per year." Dkt. 9-1 at 3–4 (Verma Decl.

¶¶ 15–17); *see also* Dkt. 15-1 at 2–3 (Williams-Rivera Decl. ¶¶ 6–7, 9–10, 12) (Plaintiff's employer stating that Plaintiff "will be replaced and result into [t]ermination" on January 5, 2021 "if she is unable to present a new EAD card").  "The delay in renewing [Plaintiff's] timely filed EAD renewal will also cause [her] to lose [her] employer-provided healthcare coverage" on which, Plaintiff explains, her "special needs son"—recently diagnosed with Sensory Integration Process Disorder and Communication Disorder—"is . . . dependent."  Dkt. 9-1 at 4 (Verma Decl. ¶ 23).  Plaintiff appears to concede, however, that her son will be able to avail himself of his father's employer's health insurance, which, while roughly $430 more expensive per month than Plaintiff's, will nevertheless allow Plaintiff's son "to continue the ongoing therapeutic care that [he] has been undertaking."  *Id.* at 4–5 (Verma Decl. ¶ 24).

## C.    Procedural Background

On November 24, 2020, dissatisfied with the pace at which USCIS was moving and facing the looming expiration of her current H-4 and EAD authorizations, Plaintiff filed suit in this Court, alleging that USCIS's ongoing delay in adjudicating her applications is unlawful.  *See generally* Dkt. 1 (Compl.).  As a remedy, Plaintiff seeks injunctive relief "[c]ompel[ling] Defendants to adjudicate [her] I-539 and I-765 applications as soon as possible and [in any event] before December 19, 2020," and "[c]ompel[ling] Defendants to issue an EAD and [to] deliver the EAD to [Plaintiff] as soon as possible and [in any event] before December 19, 2020."  *Id.* at 12–13 (Prayer for Relief).  Plaintiff also seeks an "[a]ward . . . [of] reasonable costs and attorney's fees under the Equal Access to Justice Act."  *Id.* at 13.

Plaintiff effected service on Defendants on December 10, 2020, Dkts. 6–8, and the same day filed the pending motion for a TRO and Preliminary Injunction, Dkt. 9.  Later that same day, Plaintiff also filed a notice indicating that she planned to file a motion for summary judgment. Dkt. 10.  The following day, December 11, 2020, the Court held a scheduling conference and set

a briefing schedule for the pending motion.  *See* Minute Entry (Dec. 11, 2020).  On December 15, 2020, Defendants opposed Plaintiff's motion, Dkt. 13, and moved for summary judgment, Dkt. 12.[2]  Then, on December 16, 2020, Plaintiff filed her reply in support of the pending motion, Dkt. 14, and, the following day, filed a supplemental letter from her employer, Dkt. 15, as well as her cross motion for summary judgment, Dkt. 16.  Plaintiff's motion for a TRO or Preliminary Injunction, Dkt. 9, is now fully briefed and ripe for decision.

## II.  LEGAL STANDARD

"The standard for issuance of the extraordinary and drastic remedy of a temporary restraining order or a preliminary injunction is very high, and by now very well established." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 197 (D.D.C. 2020) (quotation marks and citations omitted); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  To obtain either form of relief, a movant "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (alterations in original) (quotation marks and citation omitted).  When, like here, "the Government is the opposing party," "[t]he last two factors merge."  *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019) (quotation marks and citation omitted).  "[T]he movant has the burden to show that all four factors, taken together, weigh in favor of the injunction [or TRO]."  *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (quotation marks and citation omitted).

---

[2]  The Court will defer ruling on the pending summary judgment motions, Dkt. 12; Dkt. 16, as they have not yet been fully briefed.

Before the Supreme Court's decision in *Winter*, judges in this circuit applied a "sliding-scale" approach when evaluating whether temporary or preliminary relief should issue. *Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011). Under that approach, "a strong showing on one [of the four] factor[s] could make up for a weaker showing on another." *Id.* at 392. Since *Winter*, however, the D.C. Circuit has repeatedly suggested "that a likelihood of success is an independent, free-standing requirement." *Id.* at 393 (quotation marks omitted); *see also Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) (observing that *Winter* may be "properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned"). But as the court of appeals has explained, whether the sliding-scale approach survived *Winter* is "not yet . . . decide[d]." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016); *see also Archdiocese of Wash.*, 897 F.3d at 334 (same); *Sherley*, 644 F.3d at 392–93 (same). "In light of this ambiguity, the Court shall consider each of the . . . factors and shall only evaluate the proper weight to accord the likelihood of success if the Court finds that its relative weight would affect the outcome." *Banks v. Booth*, 459 F. Supp. 3d 143, 150 (D.D.C. 2020); *see also United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997) ("[D]istrict [court] judges . . . are obligated to follow controlling circuit precedent until either [the D.C. Circuit] or the Supreme Court[ ] overrule it.").

### III. ANALYSIS

The Court will address each of the relevant factors in turn.

### A. Likelihood of Success on the Merits

The Court first considers whether Plaintiff has established a likelihood of success on the merits of her claim that Defendants' delay in adjudicating her H-4 application and renewing her

EAD is unlawful under the APA.[3]

The APA requires an agency "to conclude a matter presented to it" "within a reasonable time." 5 U.S.C. § 555(b). "To effectuate this requirement, the statute empowers courts to 'compel agency action unlawfully withheld or unreasonably delayed.'" *Muvvala*, 2020 WL 5748104, at *3 (quoting 5 U.S.C. § 706(1)). Although "'[t]here is no per se rule as to how long is too long to wait for agency action,'" the D.C. Circuit has identified "six factors relevant to the analysis." *In re Core Commc'ns*, 531 F.3d at 855 (quoting *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004)). Known as the "*TRAC* factors"—named after their progenitor case, *Telecomms. Rsch. & Action Ctr. v. FCC ("TRAC")*, 750 F.2d 70, 79–80 (D.C. Cir. 1984)—they are as follows:

> [1] the time agencies take to make decisions must be governed by a rule of reason . . . [;] (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety

---

[3] Plaintiff's complaint also seeks relief under the Mandamus Act, which empowers courts "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361; *see also* Dkt. 1 at 11–13 (Compl. ¶¶ 51–57). Plaintiff's pending motion, however, only mentions the Mandamus Act once, and Plaintiff offers no argument why she is entitled to relief under that Act. Dkt. 9 at 15. But, even if Plaintiff had pressed her Mandamus Act argument, the analysis herein would not change, as "the standards for obtaining relief" under the Mandamus Act and the APA provision permitting courts to "compel agency action unlawfully withheld," 5 U.S.C. § 706(2)(d), "are essentially the same," *Vietnam Veterans of Am. v. Shinseki*, 599 F.3d 654, 659 n. 6 (D.C. Cir. 2010); *see also Beshir v. Holder*, 10 F. Supp. 3d 165, 172 (D.D.C. 2014) (same). And, in any event, when a plaintiff "fail[s] to establish an undue delay, [its] claim for mandamus relief under 28 U.S.C. § 1361 necessarily fails as well." *Didban v. Pompeo*, 435 F. Supp. 3d 168, 177 (D.D.C. 2020) (citing *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 63–64, (2004)); *see also In re Core Commc'ns, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) ("The central question in evaluating a claim of unreasonable delay is whether the agency's delay is so egregious as to warrant mandamus." (quotation marks and citation omitted)).

> lurking behind agency lassitude in order to hold that agency action is
> unreasonably delayed.

*In re Core Commc'ns*, 531 F.3d at 855 (quotation marks and citations omitted).  The *TRAC*

"factors are not 'ironclad,' but rather are intended to provide 'useful guidance in assessing claims

of agency delay.'"  *Id.* (quoting *TRAC*, 750 F.2d at 80).  Consequently, "'[e]ach case must be

analyzed according to its own unique circumstances.'"  *Am. Hosp. Ass'n v. Burwell*, 812 F.3d

183, 189 (D.C. Cir. 2016) (quoting *Air Line Pilots Ass'n, Int'l v. Civ. Aeronautics Bd.*, 750 F.2d

81, 86 (D.C. Cir. 1984)).  After all, "[r]esolution of a claim of unreasonable delay is ordinarily a

complicated and nuanced task requiring consideration of the particular facts and circumstances

before the court."  *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100

(D.C. Cir. 2003).

   With that in mind, the Court will evaluate the *TRAC* factors, mindful "of the particular

facts and circumstances" of this case.  *Id.*

   1.   *Rule of Reason*

   The first *TRAC* factor—that "the time agencies take to make decisions must be governed

by a rule of reason"—weighs in Defendants' favor.  *In re Core Commc'ns*, 531 F.3d at 855

(quotation marks and citations omitted).  As explained, applications like Plaintiff's "are worked

on a first-in-first-out basis."  Dkt. 12-1 at 2 (Rosales Decl. ¶ 4).  That means that "[a]pplications

filed with [the] CSC are worked according to the date the application was filed or received by

USCIS," with "[a]pplications [bearing] an older filing date . . . worked [on] before applications

[bearing] a later filing date."  *Id.*

   Those courts that have considered the issue have unanimously held that USCIS's "first in,

first out" policy for adjudicating immigration applications like Plaintiff's qualifies as a "rule of

reason," thus satisfying the first *TRAC* factor.  *See Nibber*, 2020 WL 7360215, at *5; *Muvvala*,

2020 WL 5748104, at *3; *Ray v. Cuccinelli*, No. 20-cv-6279, 2020 WL 6462398, at *8–9 (N.D.

Cal. Nov. 3, 2020).  Courts have reached the same conclusion in other immigration contexts, too.

*See, e.g.*, *Uranga v. U.S. Citizenship & Immigr. Servs.*, No. 20-cv-521, 2020 WL 5763633, at

*11 (D.D.C. Sept. 28, 2020) (U-visa applications); *A.C.C.S. v. Nielsen*, 2019 WL 7841860, at *5

(C.D. Cal. Sept. 17, 2019) (same); *Gonzalez v. Cissna*, 364 F. Supp. 3d 579, 585 (E.D.N.C.

2019) (U-Visa petitions and work authorizations).

  The Court agrees that Defendants' first in, first out policy satisfies the first *TRAC* factor.

USCIS's manner of adjudicating applications "is governed by an identifiable rationale"—all else

equal, the agency prefers to focus on those applications that have been waiting longest.  *Ctr. for*

*Sci. in the Pub. Int. v. U.S. Food & Drug Admin.*, 74 F. Supp. 3d 295, 300 (D.D.C. 2014).  That

is a sensible policy, and Plaintiff does not dispute that USCIS has abided by it here.  The first

*TRAC* factor does not require more.

  Plaintiff's argument to the contrary is unavailing.  She contends that USCIS's policy

"requir[ing] applicants applying for renewal of work permission to wait until the six-month

window prior to expiration of the document being renewed" suggests "that the agency will act in

less than six months to complete all processes necessary to deliver a work permit to the

applicant." Dkt. 9 at 18 (emphasis omitted); *see also* Dkt. 14 at 10–11.  That might be right, and

it might be that USCIS's policy of requiring applicants to wait until six months before the

expiration date to apply for renewal is ill-conceived—although one can also imagine that

permitting earlier filings might simply add to the backlog.  But that is not what this case is about.

Plaintiff is not challenging the six-month rule.  Rather, she is challenging USCIS's delay in

adjudicating her applications, and USCIS responds that it can expedite the adjudication of her

applications only by delaying the adjudication of applications of others who filed before she did.

It is in this context that USCIS relies on its first in, first out policy, and, regardless of the sensibility of the six-month rule, it does not undercut the rationality of USCIS's decision to process applications in the order that they arrived.

The Court, accordingly, concludes that USCIS's first in, first out policy qualifies as a rule of reason that satisfies the first *TRAC* factor.

2.      *Congressional Expectations*

The second *TRAC* factor considers whether "Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute." *In re Core Commc'ns*, 531 F.3d at 855.  Defendants contend that "Congress has provided no specific timetable by which USCIS must adjudicate H-4 and EAD applications, and Plaintiff does not argue otherwise." Dkt. 12 at 18.  But Plaintiff *does* argue otherwise: as she notes, 8 U.S.C. § 1571(b), the preamble to legislation providing for indefinite extensions of H-1B and H-4 status, states that "'[i]t is the sense of Congress that the processing of an immigration benefit application should be completed not later than 180 days [or six months] after the initial filing of the application,'" Dkt. 9 at 18 n.3 (quoting 8 U.S.C. § 1571(b)).

At least two courts have considered the same argument that Plaintiff now presses.  First, in *Ray v. Cuccinelli*, Magistrate Judge Corley explained:

> While section 1571 does not establish a "mandatory timeline" regarding the adjudication of H-4 status and EAD renewal petitions, "Congress [set] a normative expectation in [the statute] of a reasonable processing time for an immigrant benefit application as no more than 180 days after initial application." *Konchitsky v. Chertoff*, No. [7-cv-294], 2007 WL 2070325, at *4 (N.D. Cal. July 13, 2007).  This expectation is consistent with [USCIS's] regulation providing that the earliest an H-4 visa holder may file for work reauthorization is 180 days before their EAD expiration.

2020 WL 6462398, at *8.  Similarly, in *Nibber*, Chief Judge Howell observed:

> Although the D.C. Circuit has noted that a "sense of Congress" preamble may be "precatory" or "non-binding," and is best treated "not as a statement of fact but [as] a statement of opinion," *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 528 n.26 (D.C. Cir. 2015) . . . the second *TRAC* factor requires only some "indication of the speed with which [Congress] expects the agency to proceed," not a mandatory statutory timeline, *TRAC*, 750 F.2d at 80.  Section 1571(b) clearly envisions that USCIS will adjudicate all covered applications for immigration benefits, including Form I-539 and Form I-765 applications . . . within six months of filing[.]

2020 WL 7360215, at *6.  The Court agrees with *Ray* and *Nibber*: although Congress did not

*mandate* that USCIS adjudicate petitions within six months' time, it expressly *endorsed* that

timeline.  *See* 8 U.S.C. § 1571(b).  To be sure, that sense of the Congress does not carry as much

weight as would a statutory deadline, but it still carries some weight in the overall balance.

That, however, does not end the relevant inquiry.  Rather, even if the second *TRAC* factor

weighed (modestly) in favor of requiring USCIS to adjudicate applications within six months,

that would do little to help Plaintiff here—at least not yet.  That is because only a little over *four*

months have elapsed since Plaintiff filed her applications.  Dkt. 9-1 at 2 (Verma Decl. ¶¶ 8–9)

(Plaintiff's applications filed August 10, 2020).  USCIS, then, still has time.

3.      *Human Health and Prejudice*

The third and fifth *TRAC* factors—whether a delay is "less tolerable" because "human

health and welfare are at stake" and "the nature and extent of the interests prejudiced by delay,"

*In re Core Commc'ns*, 531 F.3d at 855—implicate similar, but not identical, considerations.  As

explained below, the Court concludes that the third factor tips modestly in favor of Defendants,

while the fifth factor tips in favor of Plaintiff.

Plaintiff makes two arguments related to the third and fifth *TRAC* factors.  First, she

contends that Defendants' unlawful delay will cause her "irreparable loss of salary," Dkt. 9 at 18,

will lead to her losing her job if she does not receive work authorization by January 5, 2021, *id.*

at 21; *see also* Dkt. 9-1 at 4 (Verma Decl. ¶¶ 17–19); Dkt. 15-1 at 2–3 (Williams-Rivera Decl.

¶¶ 6, 9–10, 12), and "will have serious negative consequences to [her] employer and [her]

career," Dkt. 9-1 at 3 (Verma Decl. ¶ 15); *see also* Dkt. 15-1 at 3 (Williams-Rivera Decl. ¶ 11).

Plaintiff further notes that her "family relies on her income to support their livelihood," Dkt. 9 at

21, and, accordingly, that terminating the family's main source of pecuniary support is a

"negative consequence[ ] . . . [that] should be avoided," especially given the ongoing COVID-19

pandemic, *id.* at 18.  Second, Plaintiff argues that Defendants' unlawful delay risks "the welfare

of [her] son[,] who currently relies on her employer-provided health insurance" to receive

treatment for his "sensory and communication disorder diagnosis."  *Id.* at 19; *see also* Dkt. 9-1 at

4 (Verma Decl. ¶ 23).  According to Plaintiff, "[t]he loss of [her] employment will also cease the

family's healthcare coverage, which is critical to Plaintiff's son at this time."  Dkt. 9 at 21; *see

also* Dkt. 9-1 at 4 (Verma Decl. ¶ 23).  And "[a]ny lapse in Plaintiff's son's ability to continue

this care," Plaintiff explains, "will directly impact his personal welfare and that of his family's."

Dkt. 9 at 19; *see also* Dkt. 9-1 at 4 (Verma Decl. ¶ 23).

Although the challenges facing Plaintiff and her family cannot be gainsaid, the Court

notes that Plaintiff's spouse is employed and that Plaintiff's family therefore has a source of

financial support beyond Plaintiff.  Plaintiff's family, moreover, will be able to obtain health

insurance—albeit at a cost of $430 more per month than they currently pay—through Plaintiff's

spouse's employer.  The Court has no reason to believe that prompt action on Plaintiff's

applications is necessary to protect the health and welfare of her family.  But, at the same time,

the Court is convinced that Plaintiff faces the very real and imminent prospect that she will lose a

job with a salary of $97,500 a year, along with valuable health benefits, if USCIS does not act on

her applications in the next few weeks.  Dkt. 9-1 at 4 (Verma Decl. ¶¶ 17–19); *see also* Dkt. 15-1 at 2–3 (Williams-Rivera Decl. ¶¶ 6, 9–10, 12).

The Court, accordingly, concludes that Plaintiff has not shown, at least at this stage of litigation, that the delay will likely impair the health or general welfare of her family, but she has shown that she is likely to suffer prejudice due to the delay.  There is no reason to believe that this setback will have long-lasting implications, but it is nevertheless a serious consequence.  As a result, the third *TRAC* factor weighs in favor of Defendants, while the fifth factor weighs modestly in favor of Plaintiff.

4.     *Effect of Expediting Delayed Action*

The fourth *TRAC* factor—"the effect of expediting delayed action on agency activities of a higher or competing priority," *In re Core Commc'ns*, 531 F.3d at 855—tips decidedly in favor of Defendants.  In view of the "importance of 'competing priorities' in assessing the reasonableness of an administrative delay," the D.C. Circuit has "refused to grant relief [for agency action unreasonably delayed], even [if] all the other factors considered in *TRAC* favored it, where 'a judicial order putting [the petitioner] at the head of the queue [would] simply move[ ] all others back one space and produce[ ] no net gain.'"  *Norton*, 336 F.3d at 1100 (quoting *In re Barr Lab'ys, Inc.*, 930 F.2d 72, 75 (1991)).  That is because "[a] court order [compelling such agency action] would only 'impose offsetting burdens on equally worthy' applicants."  *Ray*, 2020 WL 6462398, at *10 (quoting *In re Barr Lab'ys*, 930 F.2d at 73).

Here, despite the harm that Plaintiff and her family will likely suffer due to USCIS's delay, there is "no net gain" to be had from superintending the immigration queue in this case. *In re Barr Lab'ys*, 930 F.2d at 75.  Plaintiff has not alleged or offered any evidence that she is uniquely ill-situated to deal with the adjudicatory delay plaguing USCIS, nor has she argued that

USCIS has "singled [her] out for mistreatment," such that "judicial relief would then advance the cause of equal treatment and, despite the lack of any immediate net advancement of Congress's policy objectives, could make sense." *Id.* To the contrary, and with paradoxical import for Plaintiff's case, USCIS is failing many similarly situated immigrants similarly. Dkt. 9 at 18 (describing adjudicatory delays of nearly one-and-a-half years); *see also* Dkt. 12-1 at 3 (Rosales Decl. ¶¶ 10–11) (same). There are 750 people ahead of Plaintiff in the queue right now, and they have all waited longer than has she. Dkt. 12-1 at 3 (Rosales Decl. ¶ 14). To grant Plaintiff "priority [would] push [those individuals] further back in line when the only difference between them is that plaintiff has brought a federal lawsuit." *Xu v. Nielsen*, No. 18-cv-2048, 2018 WL 2451202, at *2 (E.D.N.Y. May 31, 2018). This the Court will not do.

The Court acknowledges that the blame for USCIS's delay might not rest (entirely) at Plaintiff's feet, and she might be right that the agency's adoption of the biometrics requirement has injected delay into the process. *Cf. Nibber*, 2020 WL 7360215, at *7; *see also* Dkt. 14 at 7. Yet, "[d]espite the significant burdens USCIS's approach imposes on blameless applicants, D.C. Circuit precedent recognizes 'no basis for reordering agency priorities' with respect to such matters where 'a judicial decree advancing one applicant' would not 'cure [the agency's] incompetence, . . . even if it is severe[.]'" *Nibber*, 2020 WL 7360215, at *7 (quoting *In re Barr Lab'ys*, 930 F.2d at 76). For much the same reason, neither can the Court remedy the "[un]availability of [USCIS] officers to work [on] cases," nor the agency's shortfall of resources and staff amidst the COVID-19 pandemic, Dkt. 12-2 at 1 (Lotspeich Decl. ¶ 3); *see also* Dkt. 12 at 23. Absent some evidence that the agency has improperly diverted resources from the adjudication of applications like Plaintiff's, those are "problem[s] for [USCIS or] the political branches to work out." *In re Barr Lab'ys*, 930 F.2d at 75; *see also Liberty Fund, Inc. v. Chao*,

394 F. Supp. 2d 105, 117 (D.D.C. 2005) ("[W]here resource allocation is the source of the delay, courts have declined to expedite action because of the impact on competing priorities.").

Finally, it is of no moment that ordering USCIS to adjudicate Plaintiff's application ahead of others would require that the agency expend only "minimal" effort.  Dkt. 9 at 20; *see also* Dkt. 14 at 7.  "The effect of leapfrogging Plaintiff's application to the front of the line would do nothing to cure the deficiencies of the . . . application process; it would only harm other applicants, who are equally deserving of prompt adjudication."  *Xu v. Cissna*, 434 F. Supp. 3d 43, 55 (S.D.N.Y. 2020).  Neither does it matter that USCIS could "institute a temporary measure to ensure continuation of employment authorization by permitting an automatic extension for any timely filed extension application."  Dkt. 9 at 20.  "The agency is in a unique— and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way."  *In re Barr Lab'ys*, 930 F.2d at 76.

The fourth *TRAC* factor therefore weighs heavily—and almost dispositively—in Defendants' favor.  *See Ray*, 2020 WL 6462398, at *10 ("It is appropriate to deny relief based on the reasonableness of administrative delay when relief would produce an inequitable result between applicants and do nothing to cure the deficiencies of the [adjudication] process, even if all other *TRAC* factors weigh in Plaintiffs' favor." (quotation marks and citations omitted)).

5.    *Unreasonableness of Delay*

The final *TRAC* factor instructs that "the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed."  *In re Core Commc'ns*, 531 F.3d at 855 (internal quotation marks omitted).  Plaintiff faults USCIS for adopting a biometrics requirement for work-visa applications like hers when, at the time of requirement's adoption, processing times were already "increasingly long."  Dkt. 9 at 22.  As she

notes, the biometrics requirement caused "processing times [to] skyrocket[ ] to well beyond" six months. *Id.* Plaintiff muses that "one can't help but wonder whether the biometrics requirement was an intentional roadblock to H-4 EAD recipients." Dkt. 14 at 5. But Plaintiff does not and cannot deny that USCIS was authorized to impose the biometric requirement. *See* 8 C.F.R. § 103.2(b)(9). And Plaintiff, who has already satisfied the biometrics requirement, offers no reason why the agency's exercise of that authority renders the delay in her case—or, indeed, in any other case—unreasonable. As a result, "the sixth [*TRAC*] factor is neutral," favoring neither party. *Nibber*, 2020 WL 7360215, at *8.

One final point: recall that because the *TRAC* "factors are not 'ironclad,' but rather are intended to provide 'useful guidance in assessing claims of agency delay,'" *In re Core Commc'ns*, 531 F.3d at 855 (quoting *TRAC*, 750 F.2d at 80), the Court must also consider whether "the particular facts and circumstances" of this case merit a different result, *Norton*, 336 F.3d at 1100. Here, the Court concludes that they do not. Plaintiff's plight, as unfortunate as it is, does not counsel judicial intervention in USCIS's administration of the programs at issue. To be sure, delays in the immigration system may result in significant hardships. But Plaintiff has not shown that the delay at issue here, viewed through the *TRAC* factors or otherwise, warrants the extraordinary relief that she seeks.

*   *   *

In sum, although the fifth *TRAC* factor weighs in Plaintiff's favor, the remaining factors—and especially the fourth—do not, and Plaintiff has failed to identify any additional consideration that warrants relief in the unique circumstances of this case. The Court, accordingly, concludes that Plaintiff has failed to carry her burden of demonstrating that she is likely to succeed on the merits of her unreasonable delay claim.

**B.**     **Irreparable Harm**

The Court next evaluates whether Plaintiff has established irreparable harm.  Here,

although Plaintiff's arguments are not insubstantial, the Court is unpersuaded that she has carried

her burden of demonstrating that she is likely to suffer irreparable injury in the absence of

immediate relief.

"[P]roving 'irreparable' injury is a considerable burden, requiring proof that the movant's

injury is '*certain, great and actual*—not theoretical—and *imminent*, creating a clear and present

need for extraordinary equitable relief to prevent harm.'" *Power Mobility Coal. v. Leavitt*, 404

F. Supp. 2d 190, 204 (D.D.C. 2005) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.

Cir. 1985)) (subsequent history omitted).  Moreover, "the certain and immediate harm that a

movant alleges must also be truly irreparable in the sense that it is 'beyond remediation.'" *Elec.*

*Priv. Info. Ctr. v. U.S. Dep't of Just.*, 15 F. Supp. 3d 32, 44 (D.D.C. 2014) (quoting *Chaplaincy*

*of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).  This is a "high

standard." *England*, 454 F.3d at 297.

Plaintiff identifies three ways in which she will be irreparably harmed should Defendants

fail to extend her H-4 status and grant her an EAD before December 19, 2020: (1) she will lose

wages as a result of her lost work authorization, Dkt. 9 at 23–24; (2) her "reputation with her

employer" will suffer, *id.* at 22; and (3) she will lose the "healthcare coverage upon which she

relies to cover her family including her U.S. citizen child with special needs," *id.* at 7.  The Court

addresses each in turn.

First, lost wages.  At the outset, the Court acknowledges that "economic loss sustained

due to a federal administrative action is typically 'uncompensable' in the sense that federal

agencies enjoy sovereign immunity, and the waiver of sovereign immunity in the APA does not

reach damages claims." *Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158,

170 (D.D.C. 2018).  But "the mere fact that economic losses may be unrecoverable does not, in and of itself, compel a finding of irreparable harm." *Nat'l Min. Ass'n v. Jackson*, 768 F. Supp. 2d 34, 53 (D.D.C. 2011).  That is because, even where "the plaintiff . . . cannot recover damages from the defendant due to the defendant's sovereign immunity . . . the alleged injury must be of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* at 52–53 (internal quotation marks and citation omitted).  In other words, "recoverability of monetary losses can, and should, have some influence on the irreparable harm calculus, but that recoverability is but one factor the court must consider in assessing alleged irreparable harm in the form of economic losses." *Id.* at 53; *see also DeVos*, 344 F. Supp. 3d at 170 ("[A]n asserted economic harm must be significant, even where it is irretrievable because a defendant has sovereign immunity.  In other words, the loss must . . . be serious in terms of its effect on the plaintiff." (quotation marks and citations omitted)).

As Plaintiff has explained, in view of USCIS's current processing timelines, it is likely that the agency's delay will cause her to lose her job, as well as the salary and the health benefits that come with it.  Dkt. 9-1 at 4 (Verma Decl. ¶¶ 17–19); *see also* Dkt. 15-1 at 2–3 (Williams-Rivera Decl. ¶¶ 6, 9–10, 12).  But the magnitude of the harm that Plaintiff will suffer—the *effect* of the job loss on Plaintiff—remains unclear.  Plaintiff has offered no evidence, for example, of her or her family's savings; she identifies no serious expenditure, like a mortgage payment, that she will have to forego; and she acknowledges that she can obtain health insurance through her spouse's employer.  Even when faced with stronger allegations of injury than those here, courts have declined to grant injunctive relief.  *See Muvvala*, 2020 WL 5748104, at *5 ("Although [Plaintiff] claims that [she] will be unable to make mortgage payments and payments for other expenses [and that she cannot obtain a new driver's license or any temporary driver's privileges],

20

she has not provided the Court with any information about her husband's income or the couple's savings . . . or more information regarding the timing and effects of the payments they may be unable to make.  Without this type of additional evidence, Plaintiffs have failed to demonstrate how a likely short period of lost wages will result in a harm so substantial as to be considered irreparable [even where Defendant was entitled to sovereign immunity]."); *Sagarwala v. Cissna*, No. 18-cv-2860, 2019 WL 1649943, at *3 (D.D.C. Apr. 16, 2019) ("[Plaintiff's] declaration provides no information whatsoever about [her] household income (she is married) or her current financial situation [although the declaration stated that Plaintiff cannot "afford to pay her mortgage and for other necessities"].  The Court of course understands that the loss of [Plaintiff's] salary would naturally impact her family's economic circumstances, but she cannot meet her burden without specific details regarding the extent of that impact." (internal quotation marks omitted)).

The Court does not doubt that Plaintiff will suffer a material loss—the loss of a job, in particular, is a serious matter.  But the Court is unpersuaded that Plaintiff has met her burden of establishing that this loss is sufficiently "great" to sustain a TRO or preliminary injunction, *Power Mobility Coal.*, 404 F. Supp. 2d at 204 (quotation marks and emphasis omitted); *see also DeVos*, 344 F. Supp. 3d at 170 (loss must be "serious in terms of its effect on the plaintiff" (quotation marks omitted)), particularly when balanced against Plaintiff's low likelihood of success on the merits.

Second, Plaintiff has failed to demonstrate that she will suffer irreparable damage to her reputation in the eyes of her employer.  Most notably, this alleged injury is entirely speculative.  Plaintiff has adduced no evidence that her employer will fault her for USCIS's delay.  Indeed, the evidence shows that Plaintiff's employer is aware that Plaintiff will lose her work

authorization on December 19, 2020 because USCIS has yet to adjudicate her applications.  Dkt. 15-1 at 2 (Williams-Rivera Decl. ¶¶ 7, 9).  And, to the extent Plaintiff's employer blames her for not filing her applications in June—as soon as she was allowed to do so—that injury to Plaintiff's reputation was caused by Plaintiff, not USCIS.

Finally, the health of Plaintiff's son does not compel a different result.  It is well established that "courts often find a showing of irreparable harm where the movant's health is in imminent danger." *Al-Joudi v. Bush*, 406 F. Supp. 2d 13, 20 (D.D.C. 2005).  But here, Plaintiff has offered no evidence—nor is there any in the record—that (1) her child's health is in imminent danger or that, as a result, (2) her health is imminent danger.  To the contrary, Plaintiff's own declaration suggests that her family will be able to continue the treatment her son receives, albeit by paying twice as much in insurance costs.  Dkt. 9-1 at 4–5 (Verma Decl. ¶ 24).  Had Plaintiff submitted evidence (or even alleged) that these costs were too onerous and that her son would be without the requisite medical care as a result, a finding of irreparable injury might be made.  But neither that evidence nor that allegation is present.

For these reasons, the Court concludes that Plaintiff has not established irreparable injury warranting temporary or preliminary injunctive relief.

## C.    Balance of Equities and the Public Interest

Finally, the Court turns to the last two factors—the balance of the equities and the public interest—which, as explained above, are considered "one and the same" because the government is the non-movant and "the government's interest *is* the public interest." *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).

The Court concludes that the balance of the equities and the public interest weigh in favor Defendants.  Here, as in *Muvvala*, "a court order moving [Plaintiff's] application to the front of the line of pending applications directly harms those [750 individuals] whose applications are

currently in front of hers."  2020 WL 5748104, at *6.  That harm may be minor for now—it is a judicial reordering of one—but the race to the courthouse it would incentivize will jeopardize the process that USCIS has developed to prioritize pending applications, and will risk balkanizing the immigration queue between the "have's"—those with enough money to hire lawyers—and the "have not's"—everyone else.  That system may be in Plaintiff's interest, but it is not in the public's.

**CONCLUSION**

For the reasons explained above, Plaintiff's Motion for a TRO and Preliminary Injunction, Dkt. 9, is **DENIED**.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  December 18, 2020